FREDERICK SCRANTON AND ANOTHER v. GEORGE W. TILLEY.

Where, on a question of soundness of a slave, sold with warranty by the defendant to the plaintiff, the plaintiff introduces evidence which conduces to prove the unsoundness of the slave at the date of the sale, and that the disease which he then had caused his death, the defendant should introduce some evidence as to the soundness of the slave at and before the sale, otherwise if the jury find for the plaintiff, the verdict will not be disturbed.

A new trial, it has been said, is rarely, if ever, granted on account of newly discovered evidence, if the only object of the evidence be to impeach the credit of a witness.

The affidavit of the party alone is insufficient, in support of a motion for a new trial on the ground of newly discovered evidence; if the evidence or witness is absent from the place of trial, the party should disclose the source from

which he derived his information, and prove by the affidavit of some disin-
terested person, that such information had been communicated, and that there
was some reason to believe it to be true.

An instruction asked which is inapplicable to the evidence, should be refused,
however correct it may be as an independent proposition.

The measure of damages for breach of warranty of soundness of a slave, where
the slave has died, is the price paid and interest, less the value, (if any) of
the services of the slave ; and where the purchaser has offered to restore the
slave to the seller, and he has refused to accept it, and the former has been
compelled to keep it, and incur expense on account of it, he may also recover
such expense.

Appeal from Harris.   Tried before the Hon. Peter W.
Gray.

Suit by appellee against appellants, commenced July 22d,
1854, for that the defendants, on the 6th day of July, 1853,
sold the plaintiff three slaves, warranted sound, for the price
of $3,300, one of which slaves, named Friday, was, at the time
of said sale, unsound and diseased, and had long theretofore
so been, and which was unknown to plaintiff, which unsound-
ness arose from a disease commonly called epilepsy or convul-
sions, which fact plaintiff discovered soon after he had re-
turned home with said slaves, whereupon he notified said de-
fendants of the unsoundness of said slave, and offered to re-
turn him, and thereupon defendants requested plaintiff to keep
him until Mr. Scranton should come back from New Orleans,
when they would give another slave in his place, but which
they never did, although said Scranton long since returned.—
Allegation that the slave died about the Fall of 1853, from
said disease ; that if he had been sound as warranted, his value
would have been $1,500 ; that plaintiff procured the best med-
ical attention for him ; that his services were of no value, and
that plaintiff, in addition to the loss of the value of said slave,
suffered other damage as aforesaid to the amount of $500.—
Prayer for the value of the slave and the other damages, and
general relief.

Defendants pleaded a general demurrer and denial.  The

trial took place on the 29th of December, 1855. The jury found for the plaintiff $1,100, the value of the slave, with interest from July 6th, 1853, and thirty dollars damages. Judgment accordingly, and motion for new trial overruled.

The evidence was as follows :

The bill of sale, as alleged, with warranty. First witness for plaintiff testified that the boy Friday, if sound, would have been worth about $1,100 ; witness lived with plaintiff about two months before the boy Friday died ; was under witness's management during that time ; was a cheerful, willing boy to work, when he could ; during that time, had fits twice ; saw him when he was taken with one spell of fits ; it was in February, 1854 ; was in the field cutting brambles or briars, when witness rode up to where they were working ; in a little while witness saw him fall in a fit ; had him packed to the house ; did not recover his conciousness until next day ; don't believe he ever got well enough to work afterwards ; died about the second of March ; witness knows the boy Friday was treated well.

Another witness for plaintiff, Dr. Weems, testified : The plaintiff got home with the slaves on the 8th of July ; witness is a physician and planter ; believes that Friday labored under a chronic disease of the brain ; Friday was put to picking cotton ; on the 8th of October witness was called to see him, and found him in convulsions, commonly known as epileptic fits ; also had fever ; case apparently desperate ; but in four or five days was sufficiently well for witness to leave him to the care of his master with directions that he should not be exposed to the sun in the heat of the day, nor to the cold of the early morning, and that whenever he had premonitory symptoms of the convulsions, he should take a cathartic and be dieted ; witness believed his directions were followed, as he frequently saw Friday about the house, at times when the other hands were in a push to save the cotton ; the boy was well treated, for he was evidently a favorite with his master ;

he died of disease of the brain; cannot state the time, as witness could not refer to his books, but it was several months after witness saw him in his first attack; in last attack was sick only two days; witness attended him in two attacks, but believed that he had several other slight ones, as witness was occasionally consulted about his case; cannot say how long he had been afflicted; it might have been several years; had convulsions, but they were too slight to account for the effects; in his last *fever* he had no fever as well as witness could recollect; had had no previous exhausting disease, yet he evidently died from a deficiency of nervous fluid, which is secreted by the brain; only known by its effects, and believed to be similar to, if not identical with electricity. Friday would have been worth ten or eleven hundred dollars, if he had been sound; with the knowledge which witness now has of the result, he can say he was worth nothing; witness's bill for attendance was about thirty dollars. Witness saw Friday the day he was brought home, and noticed a peculiar expression in his countenance, similar to what may be observed in persons suffering from severe headache; have seen many persons who were subject to epileptic convulsions, but never saw that peculiar expression of countenance except where the brain was affected; epileptic convulsions do not prove that the brain is diseased; in persons of a very nervous temperament, they may be produced by strong mental emotions, or by very slight disturbance of the bodily functions; but where they occur under those circumstances, they constitute but a trivial disease; and witness had known several instances of persons living to an advanced age, having been all their lives subject to frequent attacks of them; the plantations of plaintiff and witness adjoined; their houses about three quarters of a mile apart; impossible for witness to say how often he saw Friday during the Fall of 1853 or Spring of 1854; it might have been twenty, fifty or a hundred times; Friday was apparently about sixteen years old; color, between mulatto and black; delicately

formed; the peculiar expression of Friday's countenance, when witness first saw him, did not strike witness sufficiently forcible to induce him to make any remark on the subject, for witness thought that it might have been caused by dread that his new home might not be agreeable, but after witnessing his first attack of convulsions, and finding that the expression was a constant one, witness was satisfied that the expression and the convulsions had a common cause; witness believes that Friday was affected with a chronic disease of the brain, most probably a softening of its structure; he died in a slightly comatose state, from which he could be aroused, but any disturbance would throw him into slight convulsions. No post mortem examination was made. Friday was not in good health during the winter of 1853 and '54; witness saw him in the field one day, with the other hands who were at work; he was sitting down, holding his head with his hands; he told me he had a giddiness in his head; he was evidently not well, and witness directed him to go to his master for medicine, which he did; witness graduated as doctor of medicine in the University of Pennsylvania in April, 1826, at which time witness received a diploma, and since which time, witness has been practicing medicine. Friday was apparently well when he was brought home by the plaintiff; nothing noticeable except the expression of his countenance; witness wrote to Mr. Scranton for plaintiff same day Friday died; he died on the second day of his attack; witness visited him five or six times; labored under frequent but slight convulsions, and lay in a partial stupor in the intermissions; his stomach was relieved of food recently eaten, by an emetic; he was moderately purged and was blistered, but witness could not minutely state the symptoms or the precise treatment, as he kept no notes; witness has never kept notes of cases, except for publication; this case would have deserved publication, but as witness did not know the previous history of the case, it would have been of no value; witness did not make a *post mortem*

examination, because without a knowledge of the previous history of the case, it would have been valueless—it is a tedious operation, and as witness was not requested, he did not do it; witness has already stated that he believes that Friday died of some disease of the brain, which had been of long standing; witness charged plaintiff with twelve or fifteen visits to Friday, from the time he bought him, to his death; all of those visits were to Friday exculsively; besides this, witness several times gave advice for him when visiting other patients.

Another witness for plaintiff, his sister, Mrs. Emily Hooker, testified that she found Friday at her brother's when she arrived there; he was diseased, misery in his head and had fits; witness heard Mr. Scranton tell Mr. Coon, that he would have brought a negro boy over, but did not feel himself safe in doing so, for fear of the yellow fever or cholera, "tell Tilley to keep the negro boy, he knows me well enough to know that I will do what is right," and added that as soon as he felt himself safe, he would bring a negro boy to exchange for Friday, who was unsound, but who, he said, would answer his purpose as well as any; witness first saw Friday about the middle of November, 1853; he was always complaining of his head; he did not see many well days from witness' acquaintance with him until his death.

The defendants then introduced a witness, who testified that he is and was, at the time of the sale of the slaves named, in the employ of defendants as clerk; knew the slave Friday for nineteen days, from the 17th June, when they were brought here by defendants, for sale, until the 6th of July, when they were sold to plaintiff; Friday was valued at eleven hundred dollars; during that time Friday and the others were employed when needed at work about the store; he appeared well and healthy; witness heard no complaint, and saw no other evidence of sickness; Friday was a smart, active boy, not very robust; seemed accustomed to the work of a house servant.

Another witness for defendants, a physician, testified that he had read the deposition of Dr. Weems, but that from the imperfect statement of the symptoms, it was very difficult if not impossible to express a decided opinion as to the disease of which the boy died. From the symptoms given, witness would not think the disease was epilepsy or a chronic disease of the brain ; epileptic fits were not attended with fever, nor followed by coma ; softening of the brain could not be chronic, it would terminate very soon. A person attacked with sun stroke would, after the convulsions had subsided, fall into a comatose state, which sometimes continues for days. From the imperfect symptoms given, Friday's case might have been sun stroke; witness has had a case which died from sun stroke ; it occurred in the summer, and the patient had several fits during the fall and winter and died next spring ; was not well at any time after the first attack ; there was a determination of blood to the head, fever and much engorgement of the brain ; the paroxysms were severe and left the patient in a stupor ; a person would be more liable to a second attack if again exposed. Witness has practiced for a number of years, and studied his profession at a homeopathic school, but never graduated at a Medical College where diplomas were granted.

Plaintiff then introduced a witness who testified that when he lived in Wharton county, (where plaintiff resided,) he knew plaintiff and Dr. Weems well ; Dr. Weems had the reputation of a highly educated physician ; his standing was as high as any physician's in Wharton county ; the plaintiff was a large planter, and a kind, good manager of negroes.

The charge of the Court was as follows :

To entitle the plaintiff to recover it must appear that the negro was unsound at the time of the sale ; that the plaintiff, in a reasonable time after discovering the fact of unsoundness, notified defendants of it and offered to rescind the contract ; and that the negro died of the disease of which he was affected at the sale, or of disease superinduced thereby. It is immateri-

al in an action on a warranty of soundness, whether the defendants knew of the unsoundness or not, or whether they acted unfairly in making the sale.

You are to decide on the issue, from all the facts as detailed by the witnesses, and the reasonable inferences to be drawn from them. The evidence of medical men and their opinions on the nature of diseases, and the length of time of their continuance from the symptoms, are entitled to greater weight than the opinions of unscientific men ; but when medical men disagree or apparently conflict in their evidence, then the value of the evidence of each is to be decided by the same rules as apply to other witnesses, that is, from their means of knowledge of the facts, their intelligence or skill, &c.

It is not necessary that the unsoundness should be proved positively at the time of sale, beyond the possibility of a doubt; but if, from the preponderance or weight of evidence, you believe the negro was unsound at the time of sale, or that he had the insipient stages of disease at that time, and afterwards died of that disease or of a disease necessarily superinduced by it, and that the plaintiff, in a reasonable time after discovering the unsoundness offered to rescind the sale, which the defendants either refused or agreed to on terms which they afterwards failed to comply with, then the plaintiff is entitled to recover ; but if you believe otherwise from the evidence, or are not satisfied of the facts, in the proof, then find for the defendants.

If you find for the plaintiff on the breach of warranty, then he is entitled to recover the amount paid for the negro, with interest on it from the time it was paid, and also such expenses as the proof may show he was put to in having the negro attended to or taken care of.

The following memorandum was appended to the charge, by the presiding Judge :

So much of the foregoing charge, as relates to notice of unsoundness and offer to return being necessary to rescind the

contract, was based on the fact that the pleadings and argument of counsel assumed its necessity, and raised no question on the subject.

The counsel for defendants requested the Court to give the following charge, which was refused :

That the opinion of a physician, in regard to the unsoundness of a negro, is entitled to no more weight than the opinion of an unprofessional person, unless accompanied by the facts on which he bases his opinion.

The motion for a new trial was supported by the affidavit of one of the defendants, as follows : That since the trial, defendants have discovered that there is one ———— Coon, living, as they are informed and believe, in the County of Wharton, in the State of Texas, who is a material witness for them in their defence ; that the said Coon is the person with whom the plaintiff's witness, Emily Hooker, states that defendant Scranton had the conversation in regard to the boy Friday, in her presence, wherein he admitted, as she alleges, that the boy was unsound ; that defendants expect to prove by said Coon, that no such conversation as that detailed by the witness Hooker, ever occurred between defendant Scranton and the said Coon ; that defendants did not know nor believe, until they learnrd the fact since the trial, that any such person as the said Coon existed ; that they did not know of any such person or his place of residence, until since the trial, although they had made diligent inquiry in relation thereto ; that they expect to have the testimony of said Coon at the next Term of this Court, and that this new trial is not sought for delay, but that justice may be done.

*Palmer & Jordan*, for appellants, cited Murphy v. Crain, 12 Tex. R. 297 ; Otto's Syndic v. David, 9 La. R. 59 ; Deslandes v. Miller, 14 Mart. R. 53 ; Smith v. Sherwood, 2 Tex. R. 460 ; Graham v. Roder, 5 Tex. R. 141.

*J. W. Henderson* and *C. W. Buckley*, for appellee.

WHEELER, J.. Under the charge of the Court as applied to
the evidence, the jury, in finding a verdict for the plaintiff,
must have acted under the conviction, that the negro was dis-
eased at the time of the sale and warranty, and that. that dis-
ease caused his death.    That was what the evidence conduced
to prove ; and it was only upon that supposition, or belief,
that the jury could have found a verdict for the plaintiff.    If
the evidence was sufficient to warrant that conclusion, the ver-
dict was right, and in accordance with the previous decisions
of this Court.   (Murphy v. Crain, 12 Tex. R. 297 ; McKinney
v. Fort, 10 Id. 220.)  , The evidence, it must be admitted, is
not very satisfactory, as to the fact of disease or unsoundness
at the time of the sale.    And it is to be regretted that ,the
rights of parties must be finally determined upon evidence,
which is not more convincing and satisfactory.    But we. can-
not say, that the jury were not warranted by the evidence,, in
coming to the conclusion at which they arrived ; or that,.:the
Court erred in refusing a new trial on that ground.    The evi-
dence before the jury certainly conduced to support the, ver-
dict ; and it is a circumstance not to be disregarded, that. the
defendants offered no evidence to the contrary, except; the
testimony of a witness, as to the apparent soundness of the
negro for a few days before the sale ; and that was but. little
more than appeared from the plaintiff's evidence.    If the. sup-
posed unsoundness existed, it is evident from the testimony. of
the plaintiff's witnesses, that it was not so apparent as to: at-
tract observation ; or as to be likely to be known to one whose
acquaintance with the negro was of but few days duration.    It
does not appear how long the defendants had owned him ;, or
what means they had of proving what had been his previous
state, as to health and soundness.    But the reasonable supposi-
tion is, that they were better informed upon that subject than
the plaintiff : and that, if he had not previously exhibited
symptoms of the disease which caused his death, they ·might
have obtained evidence to that effect.    Such evidence, if· it
existed, must be supposed to have been more accessible to

them than to the plaintiff: and had it been proved, by the testimony of those who had the means of knowing, that for any considerable length of time previously, the negro had been apparently sound, there can be little doubt, the verdict would have been different. The failure to afford any information as to the state of health and soundness of the negro, for any considerable time before the sale, must have operated very prejudicially to the defendants, upon the trial. If injustice has been done them by the verdict, it is probably to be ascribed to the want of proper diligence on their part, in preparing for the trial. If the truth and right of the case were with them, it would seem, they might have adduced some evidence to support that conclusion, for they had ample time to prepare for the trial.

The sole object of the newly discovered evidence, which was made a ground of the motion for a new trial, appears to have been, to discredit the testimony of one of the plaintiff's witnesses. A new trial, it has been said, is rarely, if ever, granted on account of newly discovered evidence, if the only object of the evidence be to impeach the credit of a witness. (McIntire v. Young, 6 Blackf. 496 ; Reed v. Green, 5 Ham. 375 ; 2 Denio, 109 ; 11 Barbour Sup. Ct. 215.) The defendants were not unapprised of what was proposed to be proved by the witness ; and if the application were supported by the affidavit of the witness, it would not present a case which would have warranted a departure from the general rule. But it rested on the unsupported affidavit of the party. He might, at least, have disclosed the source from which he derived his information, and proved by a disinterested witness that such information had been communicated, and that there was some reason to believe it to be true. We cannot say, that the Court ought to have been satisfied, from the statement of the party, that he would be able to prove what he proposed, upon another trial, if even that would have been sufficient. The application, upon this ground, was manifestly insufficient, under the oft re-

peated decisions of this Court.　(3 Tex. R. 49 ; 4 Id. 311 ; 8 Id. 237 ; Id. 331 ; 10 Id. 268.)

The instruction asked by the defendant was rightly refused, for the obvious reason, that it asked the Court to assume, contrary to the fact, that the physician, to whose testimony it had reference, had not stated the facts on which his opinion was founded.

As to the measure of damages, the charge of the Court was in accordance with the rule maintained by this Court in the case of Anderson v. Duffield, (8 Tex. R. 237,) and, as we think, the correct rule, where the slave has died, or become valueless, and a total loss to the plaintiff.　The same rule has been maintained by other Courts in this class of cases, though not, perhaps, with entire uniformity.　Thus, in North Carolina, in an action for a breach of warranty of soundness, where it appeared that the slave had taken the infection of the small pox, of which he died, it was held, that the price given for him, with interest, was the true measure of damages ; he having been a total loss to the plaintiff, and there being no evidence that the price was not the market price. (Williamson v. Candday, 3 Iredell, 349.)　And in South Carolina, it has been held, that in an action on the covenant of warranty of soundness, where there has been a rescission of the contract, or where the property is dead or valueless, the plaintiff is entitled to recover back his purchase money and interest.　And where he has offered to restore the property to the defendant, and he has refused to accept it, and the plaintiff has been compelled to keep the property, and incur expense on account of it, he may also recover such expenses.　(Seibles v. Blackwell, 1 McMullan, 56.)　So also in Mississippi, in such action, it is held that, if the slave proved to be worthless, the measure of damages should be the sum paid for the negro with interest.　(Walker, 150.)

Where however the plaintiff has enjoyed the benefit of the services of the negro, for any considerable length of time, and

Scranton v. Tilley.

they have been valuable to him, such services ought to be an offset to the damages to the extent of their value. The value of the services, in this case, was not proved; but it would seem, from the evidence, that the negro performed the services of an ordinary hand, for a period of several months. The evidence, we think, was sufficient to extinguish the claim for interest; and to that extent, the verdict is apparently excessive. The charge of the Court, as to the measure of damages, we deem to maintain the correct general rule; and had the attention of the Court been called to this point, by instructions asked upon it, the charge would doubtless have been so far modified as to have given the defendants the benefit of the value of the services of the negro while in the plaintiff's service. But the point does not appear to have been suggested by counsel in the Court below, either by asking a proper instruction, or in their motion for a new trial: and on this account, there might, perhaps, be some difficulty in reforming the judgment in this respect, in this Court. But as the plaintiff has intimated a willingness to remit the interest, which will remove the difficulty, his remittitur will be received, and the judgment be otherwise affirmed, at the cost of the appellants.

. Judgment affirmed.